Filed 5/18/22  P. v. Lynch CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046478 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1484487) |
| v. | |
| JACOB JIMMIE LYNCH, | |
| Defendant and Appellant. | |

Defendant Jacob Jimmie Lynch was convicted by a jury of first degree murder (Pen. Code, § 187, 189),[1] assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and active participation in a criminal street gang (§ 186.22, subd. (a)), and gang enhancement (§ 186.22, subd. (b)) allegations and a gang murder special circumstance (§ 190.2, subd. (a)(22)) allegation were found true.  The trial court sentenced him to 25 years to life consecutive to a determinate term of six years.

On appeal, he contends that the judgment must be reversed because (1) the prosecutor made inaccurate statements to the jury in argument about the nature of premeditation and deliberation, and the trial court misinstructed the jury on premeditation, (2) the fact that three prosecution witnesses received benefits from their plea agreements after trial that exceeded what they had originally been promised established that the prosecutor committed misconduct and that the trial court erred in

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

denying defendant's new trial motion, (3) the trial court prejudicially erred in permitting the prosecution to have a former codefendant testify as a gang expert because he was unqualified and in restricting defendant's trial counsel's cross-examination of this witness regarding his qualifications, (4) there was insufficient evidence to support a natural and probable consequences theory of liability for the aggravated assault count, and the trial court erroneously instructed the jury on that theory, (5) these errors were cumulatively prejudicial, and (6) a retrial of the active participation count, the gang enhancements, and the gang murder special circumstance is required due to recently enacted changes to section 186.22 that narrow their elements. We find merit in his first, fourth, and sixth contentions and reverse the judgment.

## I.     THE PROSECUTION'S CASE

On April 27, 2012, at around 6:00 p.m., Juan Reyes Sanchez (Sanchez) took his two sons, 20-year-old Juan Reyes, Jr. (Juan) and 14-year-old Heriberto Reyes (Heriberto), to Roosevelt Park in San Jose to play basketball. They had played basketball at Roosevelt Park several times before. Heriberto was "too small" to play with the adults, so he just watched the games.

When they arrived at the park, Heriberto and Juan went directly to the basketball court, while Sanchez remained in the parking lot talking to a friend. Juan grabbed a can of beer as he headed toward the basketball court. Juan was wearing a white T-shirt and green shorts. Heriberto was wearing a white T-shirt, gray shorts, and a blue hat. Sanchez's brother, Gustavo, was already at the basketball court when Heriberto and Juan arrived.

As Heriberto and Juan approached the basketball court, three or four strangers, including defendant and Clemente Salas, who appeared to be between 15 and 20 years old, "stopped them in the middle of the court and started asking them questions." Juan was standing "right next to" Heriberto at this point. One of the strangers asked

2

Heriberto if he was "a gangbanger." Heriberto said no, but the stranger continued to ask him if he was a gangbanger or "a Sureno." One of the other strangers told Heriberto that he "looked like a Sureno." The strangers asked Heriberto if he had tattoos, and they lifted up his shirt. Heriberto said "don't touch me" and "moved back." Salas lifted up Heriberto's shirt, and Heriberto lifted up his arms. The strangers yelled "scrapa" at Heriberto.

Juan told the strangers "[w]e don't want any problems," " '[l]eave us alone, we don't have anything. We just came here to play.' " The strangers ignored Juan and kept questioning Heriberto. Juan tried to move toward Heriberto to protect him, but then the strangers started hitting Heriberto. Juan noticed a lot of other people running toward them. When Juan tried to intervene to protect Heriberto, a group of strangers surrounded Juan and started hitting him, and he was separated from and unable to reach Heriberto.

Salas hit Heriberto in the back of the head, and Heriberto immediately fell to the ground. After he fell to the ground, he tried to get up, but Salas and defendant starting kicking him in the head.[2] They kicked Heriberto in the stomach and face, and continued to kick and stomp on Heriberto's head, stomach, legs, and back as Heriberto remained motionless on the ground. This attack continued for three to five minutes.

At least five people, including Scott Conway, assaulted Juan. Juan threw a punch and then threw his half-full beer can at the strangers who were attacking him and Heriberto. The beer hit one of the strangers in the face, and Juan's punch also made contact. However, Juan was soon knocked unconscious by blows from the

_____

[2] Defendant's DNA was found on a black baseball cap with an R on it that was recovered at the scene, and multiple witnesses reported seeing him wearing this cap during the attack on Heriberto.

3

strangers. As many as 15 people ultimately joined in the assault on Juan. Eventually the attackers ran away, leaving Juan lying on the ground unconscious.

When Sanchez and his friend arrived at the basketball court, they found Heriberto and Juan lying on the ground and saw "a lot of people" running away. Heriberto was unconscious and bleeding from the side of his head, and his mouth, nose, and ears. Sanchez took Heriberto to the hospital, but Heriberto never moved or regained consciousness.

The incident was witnessed by Felix V., an 11-year-old boy who had known Conway and defendant for years and often saw them and Salas at Roosevelt Park. Felix looked up to defendant and Conway and loved them. Felix's father was a member of the Roosevelt Park Locos (RPL) gang and had a "Norte" tattoo on the back of his head. Defendant and Conway were both members of RPL. Although Felix did not see the beginning of the confrontation, he saw defendant punch Heriberto in the face and knock him down and unconscious. Felix also saw Heriberto being "stomped on," kicked in the face and body by multiple people, and left bleeding. After the altercation began, Felix heard his father yelling at defendant by name and telling him "to stop." Defendant did not stop. Felix testified that defendant "wasn't just taking care of one guy," "[h]e was also like running around" as Conway was.

Heriberto died from his injuries. He had suffered multiple blunt force injuries to his arms and legs, but his death was caused by blunt force injuries to his head. There were injuries to his eyes and mouth, the top of his skull, the base of his skull, and the back of his skull. His brain had suffered contusions, and the "profound swelling in the brain" had caused his death. His brain injuries were caused by multiple blows to the head coming from different directions. "[T]he bottom of his brain was forced into the bottom of his skull, which killed him." There were no injuries to his hands.

4

Three of the participants in the attacks on Heriberto and Juan, James Conklin, Ruben Becerra, and Angel Lamas, ultimately entered into plea agreements and testified for the prosecution at trial.

Conklin testified that he heard defendant yell " 'Where are you from?' " and " 'You look like a fucking scrap.' " Conklin could see that these statements were being directed at Heriberto, and he saw Heriberto put up his hands and say " 'no, I don't bang.' " Juan, who was next to Heriberto, put his arm in front of Heriberto and said "he don't bang" and "we don't bang." Conklin could see that five or six people, including defendant and Salas, were confronting Juan and Heriberto. Conklin and Conway joined them. Conklin saw defendant "belt check" Heriberto in an attempt to identify his gang affiliation. Defendant lifted up Heriberto's shirt and said " 'belt check this fool' " and " '[l]et me see your fucking belt.' " Defendant also said " 'he looks like a scrap.' " Salas also lifted Heriberto's shirt and made similar statements.

Although Heriberto had no tattoos and no belt, defendant and Salas said "fuck that, we think this fool is a scrap." Defendant then "threw the first punch" at Heriberto, striking Heriberto's mouth. Heriberto stumbled backwards. Salas grabbed Heriberto's shirt and punched Heriberto in the jaw. Heriberto fell to the ground, and "everybody" began stomping their heels on his face. Conklin saw defendant stomp on Heriberto's head four or five times, and Salas did the same. Joe Chavarria and Ruben Becerra were stomping on Heriberto's body.[3] After Heriberto was punched, Juan punched Conway in the head, and Conklin "swung on" Juan. Conway and Juan began exchanging punches, and Conklin joined in the attack on Juan. Juan was trying to get

---

[3] Conklin also admitted that he had testified before the grand jury that Becerra had told him, after the incident: " 'I was on that fool' " and " 'That fool was a scrap.' "

5

to Heriberto, but Conklin and Conway prevented him from doing so. After the fight with Juan ended, Conklin saw defendant and others continuing to stomp on Heriberto.

Ruben Becerra testified that he saw Heriberto wearing a blue hat. Becerra looked at Victor Villar, who said "go." Victor Villar was an RPL member and the "shot caller" for RPL.[4] At the same time, Becerra saw Villar direct the attention of Salas and defendant toward Heriberto. Becerra, Salas, and defendant approached Heriberto. Becerra asked Heriberto "if he banged." Heriberto did not respond, but Juan stepped in front of Heriberto. Juan pushed Heriberto behind him and said that Heriberto "doesn't play that stuff and to leave his brother alone." Becerra grabbed Heriberto's arm and lifted his shirt to look for tattoos. Heriberto did not react, and Becerra found no tattoos. Becerra said to Salas: " 'He's cool. He doesn't bang.' " Heriberto began backing up. Defendant then ran "around" Juan and punched Heriberto in the face. Heriberto fell to the ground on his back. Salas and Becerra then began punching Heriberto repeatedly in the face. He did not respond at all except to briefly put his hands over his face. Becerra stopped hitting Heriberto, and Salas started "[s]tomping" on Heriberto's face. Becerra stepped back and watched. Defendant and Salas both repeatedly stomped on Heriberto's face.

Becerra saw Juan hit Salas hard in the face. Conway ran up and started fighting with Juan. Juan initially fought back, but Conway threw Juan to the ground. Conway was immediately joined by Conklin and two others. Their assault on Juan moved away from Heriberto to the other end of the basketball court. Once Juan was on the ground, he stopped fighting back. The four assailants continued to hit and kick Juan. Toward the end of the assault on Juan, Victor Villar joined in and kicked Juan. Eventually, the assailants stopped and ran away.

---

[4] Becerra obeyed Villar because he believed he would be "beat up or something" if he did not.

Angel Lamas testified that he saw defendant at the park with the Villar brothers. Lamas saw Heriberto, who was wearing a blue hat, arrive, and he saw defendant approach Heriberto. Defendant appeared to be questioning Heriberto, and Lamas saw defendant lift Heriberto's shirt. Conway approached and stood next to defendant. Juan tried to intervene between Heriberto and defendant. Heriberto backed up, and then defendant punched Heriberto in the forehead. About a minute and a half elapsed from the time defendant approached Heriberto to the time that defendant hit Heriberto. Heriberto fell to the ground. Lamas saw that defendant was kicking and Salas was kicking and stomping on Heriberto's chest and head. Lamas did not see defendant stomp; he only kicked. This kicking and stomping went on for a minute and a half.

Meanwhile, Juan threw a beer at defendant and Conway, and the beer can bounced off defendant's face and splashed onto Conway. Juan then threw a basketball, which hit Conway in the head. Lamas responded by hitting Juan in the face. Conway then began punching Juan. Other people, including Conklin, joined the fight. Eventually five people were assaulting Juan. Juan was knocked to the ground, and his assailants continued to punch and kick him.

The first person Lamas saw running away was defendant. A few weeks after the incident, Lamas had a conversation with defendant. Lamas said "that shouldn't have happened," and defendant responded: " 'Fuck that fool. He was a scrap.' " After the incident, Felix Villar telephoned Lamas and threatened that he would be beaten if he talked about the incident.

## II.    THE DEFENSE CASE

The defense presented a gang expert who testified that RPL was not a Norteño gang and was not a criminal street gang, and that those who committed the offenses were largely not gang members.[5] The defense also presented the testimony of Ricardo

---

[5] Defendant was tried jointly with Salas and Conway.

Weinstein, an expert in psychology and neuropsychology, who had examined Salas and determined that he suffered from brain abnormalities and PTSD. In addition, Weinstein testified that as a result of traumatic events Salas had experienced, he was unable to make decisions. The defense also presented testimony by a forensic drug analyst about the effects of marijuana and alcohol, which there was evidence that some of the perpetrators had consumed before the incident.

Salas testified on his own behalf. He denied being an RPL member or a member of any gang. When he identified himself as a "northerner," he simply meant that he was from Northern California. Salas testified that all he remembered was being punched "[h]ard enough to be unconscious." The next thing he remembered was pushing someone off of him and seeing people running away. He testified that he could not remember what happened after that until he was in Chavarria's truck. He denied assaulting Heriberto. He testified that after he regained consciousness, he shoved Juan off of him. Salas testified that Gustavo Reyes, Conklin, Lamas, and Becerra were lying.

## III. PROCEDURAL BACKGROUND

Defendant, Conway, and Salas were jointly tried for the murder of Heriberto, the aggravated assault on Juan, and active participation in a criminal street gang, and gang enhancements were alleged against all of them and a gang special circumstance allegation was alleged against defendant and Salas. Defendant's trial counsel urged the jury to find that defendant was guilty of only involuntary manslaughter because that offense was "the best fit." The jury found defendant guilty of first degree murder, aggravated assault, and active participation, and it found the gang enhancement and gang special circumstance allegations true.[6]

---

[6] Salas was also convicted of these same counts and had the same allegations found true. Conway was acquitted of the murder count but convicted of the

8

Because defendant had been a minor (17 years old) at the time of the crimes, his case was remanded to juvenile court for a fitness hearing under then newly enacted Proposition 57.  The juvenile court held a transfer hearing and transferred defendant back to adult criminal court.  Defendant then filed a motion for a new trial, which was denied.  The court agreed with the probation report's recommendation and imposed a sentence of 25 years to life for the murder consecutive to a six-year term for the aggravated assault and the gang enhancement.[7]  Defendant timely filed a notice of appeal.

## IV.    DISCUSSION

### A.    *Premeditation and Deliberation*

Defendant contends that the prosecutor improperly argued to the jury that defendant's premeditation and deliberation was demonstrated by the fact that defendant lifted Heriberto's shirt and then punched him.[8]  We requested supplemental briefing on whether the trial court's premeditation instructions were prejudicially erroneous and whether the prosecutor argued inconsistent legal theories with regard to premeditation that were prejudicially erroneous.

#### 1.    *Background*

The court instructed the jury:  "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  "Nothing that

---

aggravated assault count, the active participation count, and other unrelated counts, and accompanying gang enhancement allegations were found true.

[7] The six-year determinate term was composed of a three-year midterm for the assault count and a three-year term for the gang enhancement.  The court imposed an unstayed concurrent term for the active participation count.

[8] He also contends that the prosecutor improperly drew an analogy between premeditation and deliberation and the process that a person goes through in deciding whether to drive through a yellow light.  Because we determine that defendant's other arguments establish that the first degree murder conviction cannot be upheld, we need not address this contention.

9

the attorneys say is evidence. In their opening statements and closing arguments the attorneys discussed the case, but their remarks are not evidence."

The court's instruction to the jury on premeditation and deliberation was extracted from CALCRIM No. 521.[9] "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. [¶] On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. *A person commits an act willfully when he or she does it willingly or on purpose. A person deliberates if he or she carefully weighs the considerations for and against his or her choice, and knowing the consequences decides to act.* [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder and the murder is second-degree murder." (Italics added.)

The prosecutor appears to have explicitly told the jury that he was contending *only* that this was an implied malice murder. "Now, there's two types of malice. I

_____

[9] It is unclear how this instruction was created. The instruction conference was not reported, and the parties agreed on the record to the jury instructions.

10

mentioned it earlier there's express malice, unlawfully intended to kill. This is what I think the evidence shows. It's implied malice. It's implied. They didn't know Heriberto. They didn't -- they didn't plot or say, you know, well, next time I see that guy, I'm going to kill him. There's none of that evidence. This is implied malice. This is someone who comes to the park. They think he's a rival gang officer [*sic*]. And they commit the act. And the natural and probable consequences, and I'll insert of stomping somebody in the head numerous times for minutes is dangerous to human life."[10]

The prosecutor then appears to have argued that this implied malice murder was deliberate and premeditated. The prosecutor told the jury that "the law holds us all responsible for the choices that we make." He emphasized that defendant was "with Heriberto anywhere from 30 seconds to a minute," and "when you're deliberating or contemplating whether or not you're *going to hit somebody*, that's a long time." (Italics added.) The prosecutor tried to demonstrate to the jury how long a minute was. "I argue that one minute is an awful long time. And I'm going to count off one minute starting now. [¶] Stop. That's one minute. In this situation, that's a long time. It's a long time to deliberate. It's a long time to process what's going on, and it's a long time to finally *make a decision you're gonna hit the kid* anyway." (Italics added.) The prosecutor then read to the jury the premeditation instruction that the trial court had given to the jury. He told the jury: "A person commits an act willfully

---

[10] The Attorney General contends that this portion of the prosecutor's argument was not a concession that the murder was an implied malice murder. He reads this passage as an argument that the murder was an express malice murder. We disagree. The prosecutor did not discuss express malice at all except to acknowledge that express malice was one type of malice, and he did not argue that the murder was an express malice murder. His entire argument was that the murder was an implied malice murder. Even if this was not an express concession, it was at the very least an implied concession that the murder was an implied malice murder.

11

when he or she does it willingly or on purpose. A person deliberates if he or she carefully weighs the consideration [*sic*] for or against his or her choice and knowing the consequences, *decides to act*." (Italics added.) He argued that "[defendant] figured out a way to maneuver around Juan Reyes and *hit* Heriberto. *That's deliberation*. That's plotting." (Italics added.) "Premeditation and deliberation comes -- it's that quick."

In his closing argument, the prosecutor continued to focus on defendant's decision to *hit* Heriberto: "They checked him. . . . That is a deliberative process that gang members are doing to somebody *before they attack them*. That's what they do. That's deliberation." "[Defendant's] one punch . . . is enough to convict [defendant] of first degree murder. *As long as . . . they were checking him before [defendant] punched him. That's premeditation*. The one punch is enough for murder . . . ." (Italics added.) Defendant's trial counsel objected to this argument on the ground that it "[m]isstates the law," but the trial court overruled the objection, referencing the "[s]ame admonition," that is, the court's admonition that the instructions governed over what the attorneys argued.

### 2. *Analysis*

"Malice may be either express or implied. (§ 188.) Express malice is an intent to kill. [Citation.] Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "A verdict of deliberate and premeditated first degree murder *requires more than a showing of intent to kill*." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080, italics added.) First degree premeditated murder requires proof of a *decision* to kill. "The law recognizes two degrees of murder. The degrees are distinguished by the mental state with which the killing is done. A person who kills unlawfully with

12

implied malice is guilty of second degree murder. [Citation.] A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. [Citation.] If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree." (*Gonzalez*, at p. 653, fn. omitted.) "[T]he killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)

"It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' " (*People v. Anderson* (1968) 70 Cal.2d 15, 24-25.) "[B]rutality alone cannot show premeditation; a brutal killing is as consistent with a killing in the heat of passion as with a premeditated killing." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.)

The trial court included two sentences in its premeditation instruction that did not address the premeditation and deliberation that is necessary to elevate a murder to first degree: "A person commits *an act* willfully when he or she does it willingly or on purpose. A person deliberates if he or she carefully weighs the considerations for and against his or her choice, and knowing the consequences *decides to act*." (Italics added.) While these sentences are similar to a portion of the premeditation instruction set forth in CALCRIM No. 521, these two sentences are *not* part of the instruction on *premeditation and deliberation*. Instead, these two sentences are part of a three-sentence portion of the section of CALCRIM No. 521 that is devoted to first degree murder *by torture*. (CALCRIM No. 521, section B.) The third sentence of that portion, which was not included in the trial court's instructions to the jury here, reads:

"The defendant *acted with premeditation* if (he/she) *decided to kill* before completing the act[s] that caused death." (CALCRIM No. 521, section B, first italics original, second italics added.) The trial court made a mistake in including these two sentences in its premeditation instruction because these two sentences told the jury that it was the decision "to act" rather than the decision "to kill" that was required to be premeditated and deliberate. While other portions of the trial court's premeditation instruction accurately stated the correct standard ("decided to kill"), the erroneously included portion created an ambiguity about whether a decision "to act" was sufficient.

"When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) "The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

The Attorney General argues that the inclusion of these two sentences in the trial court's instruction was not error because the jury was unlikely to understand these sentences to permit it to return a first degree murder verdict without finding that it was a decision to kill that was premediated rather than a decision to *act*. We disagree.

The prosecutor's erroneous arguments to the jury, which were expressly interlinked with the two inappropriate sentences in the court's instruction, created a reasonable likelihood that the jury would apply the court's improper instruction in an impermissible manner. The prosecutor extensively utilized the inappropriate language in the trial court's instructions in his arguments to the jury. He read the mistakenly included sentences to the jury and relied on them to argue that it was defendant's *decision to hit or punch* Heriberto that needed to be premeditated. As defendant's trial counsel accurately pointed out at trial, this portion of the prosecutor's argument

14

misstated the law.  The combination of the trial court's misinstruction and the prosecutor's extensive reliance on that misinstruction to argue a legally invalid theory requires us to find that the jury was likely to apply the court's instruction in an improper manner.  Accordingly, we conclude that the trial court's inclusion of these two inappropriate sentences in its premeditation instruction was error.

The next question is whether this instructional error was prejudicial.  The Attorney General concedes that, if the inclusion of these inappropriate sentences in the instruction was instructional error, the error was prejudicial.  Because the trial court gave both correct and incorrect instructions on the applicable law to the jury on the requirements for a finding of premeditation, it committed a type of instructional error known as "alternative-theory error."  (*People v. Aledamat* (2019) 8 Cal.5th 1, 9.)  Here, the legally inadequate theory was that a decision to act, rather than a decision to kill, could support a first degree murder conviction.  Prejudice from this type of error is assessed under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), which requires "the beneficiary of a constitutional error [(the Attorney General)] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  (*Chapman*, at p. 24; *People v. Wilkins* (2013) 56 Cal.4th 333, 348 (*Wilkins*); *People v. Reese* (2017) 2 Cal.5th 660, 671.)

Here, the trial court misinstructed the jury on the premeditation element of first degree murder, and the prosecutor's arguments based on the erroneous instructional language dramatically increased the potential for prejudice from the trial court's instructional error.  We must also consider the impact of the fact that the prosecutor appeared to concede at trial that the murder was an implied malice murder but

15

nevertheless argued that the murder was premeditated.[11] "Implied malice does not require an intent to kill." (*People v. Gonzalez, supra*, 54 Cal.4th at p. 653.) An implied malice murder, that is, a murder without the intent to kill, cannot be a premeditated murder because a person who acts without the intent to kill cannot have made a *decision to kill* before doing the act that causes death.

By arguing to the jury that the murder was an implied malice murder and at the same time arguing that the murder was premeditated, the prosecutor explicitly encouraged the jury to follow the erroneous instruction. As defendant observes, the prosecutor "argued this case in a legally invalid manner." Even if there was substantial evidence that defendant made a premeditated decision *to kill* Heriberto, a possibility that the prosecutor himself denied, the trial court's instructional error and the prosecutor's improper arguments based on that error demonstrate at least a reasonable possibility that the jury did not rest its premeditation finding on a proper basis.[12] (*Wilkins, supra*, 56 Cal.4th at p. 348.) It follows that the error was prejudicial and that the first degree murder conviction cannot stand. On remand, the prosecutor may elect to retry the first degree murder count or may elect to accept a second degree murder conviction in its stead.[13]

---

[11] As we have already noted, the Attorney General rejects the notion that the prosecutor's argument appeared to concede that the murder was an implied malice murder. We do not agree.

[12] Defendant denies that he is challenging the sufficiency of the evidence of premeditation and deliberation.

[13] Defendant's new trial motion also asked the court to reduce the murder conviction to second degree murder.

**B.**   *Posttrial Changes to the Plea Agreements of Conklin, Lamas, and Becerra*

Defendant contends that the prosecutor committed misconduct and the trial court abused its discretion in denying his new trial motion based on posttrial alterations to the plea agreements with Conklin, Lamas, and Becerra. His new trial motion was based on the fact that, after trial, Conklin and Lamas were permitted to withdraw their pleas to voluntary manslaughter, and they and Becerra were immediately released and later sentenced to time served. Defendant's new trial motion asserted that these posttrial events meant that there had been an "objective fraud" on the jury. He renews that claim on appeal. We find no misconduct or abuse of discretion.

**1.**   *Background*

Conklin, Becerra, and Lamas, each of whom had participated in the attack on Heriberto or the attack on Juan, testified at trial for the prosecution. The three men had entered into plea agreements with the prosecutor prior to trial under which they pleaded guilty or no contest to voluntary manslaughter and aggravated assault and admitted gang enhancement allegations. These agreements capped the amount of prison time that each of them faced but did not preclude probation or specify any minimum prison term.

Conklin testified at trial that he had been in jail for three and a half years. He had originally been charged with murder and understood that a murder count exposed him to a lifetime in prison. Conklin testified that he had entered into a plea agreement with the prosecution under which he pleaded no contest to voluntary manslaughter of Heriberto and aggravated assault on Juan and admitted gang enhancement allegations. His plea agreement limited his sentence to a "maximum" of 13 years in prison with no minimum. Conklin told the jury that he had not been sentenced, hoped for "leniency"

due to his testimony, and understood that he could be freed on the day of his sentencing.

Conklin was heavily cross-examined. He testified that he was willing to do "[w]hatever it takes to get out of jail." He acknowledged that he initially lied to the police about his involvement in the incident. He eventually decided to tell the truth, and he hoped that by telling the truth he would be "granted leniency." His statement to the police was made only after it was promised that nothing he said would be used against him. Conklin admitted that he had smoked marijuana and drunk alcohol on the day of the incident and was "impaired" at the time of the incident. Conklin's plea agreement was admitted into evidence. He testified that under the plea agreement, it was possible that he would receive probation. The defense cross-examination emphasized that Conklin could be released immediately after he was sentenced.

Like Conklin, Becerra was heavily cross-examined at trial. He admitted that he had originally lied to the police about the incident because he was facing a murder charge and wanted to get out of jail. During his initial interview, he falsely implicated people who were not involved and also implicated defendant and Salas. Even during a second police interview, Becerra was not completely truthful. It was only in a third police interview that he told the full truth. Becerra testified that he had pleaded to a voluntary manslaughter charge with a gang enhancement. Although he understood that he faced a maximum of 22 years in prison, he did not know what sentence he would receive. He hoped and believed that it was possible that he would be released from custody right after he was sentenced.

Lamas too was heavily cross-examined by the defense. Felix Villar, Sr. was Lamas's godfather, and his son, Felix Villar, Jr. was one of Lamas's role models. Lamas had been a member of RPL since 2006. In 2008, Lamas was arrested for domestic violence on defendant's sister. Lamas lived with defendant's sister in 2008 and also at the time of the April 2012 incident. He and defendant's sister had multiple

18

children together.  In June 2012, Lamas was again arrested for domestic violence against her.  They were subsequently involved in a child custody dispute, which resulted in Lamas's mother taking custody of the children.

Lamas admitted that when he was first interviewed by the police, he did not tell the police the whole truth.  He did not implicate himself or his cousin, Javier Hernandez, in the fight.[14]  The second time he was interviewed, he still did not tell the whole truth.  The third time he was interviewed, he finally revealed his role in the incident.  Lamas understood that he faced a maximum of 13 years in prison, but he had "no idea" how long he would be incarcerated.  He hoped that he would be released from custody on the day of his sentencing.

The jury was instructed that Lamas, Conklin, and Becerra were accomplices and that defendant could not be convicted based on their testimony alone; independent evidence was required to support a conviction.  The jury was also instructed to view their testimony "with caution."  And the jury was instructed that the testimony of an "in-custody informant should be viewed with caution and close scrutiny" and that the jury should "consider the extent to which it . . . may have been influenced by the receipt of or expectation of any benefits from the party calling that witness."  Defendant's trial counsel argued to the jury:  "[S]ome of the testimony was obviously made up.  We, of course, have the self-serving testimony of the co-defendants who made a deal.  I call them the dealmakers."  "They can't all be telling [the] truth because they contradict each other."  He emphasized that the former codefendants could receive "probation" or "walk out of here."

---

[14] It was stipulated that Hernandez and Chavarria, who had originally been jointly charged with defendant, Salas, and Conway, had pleaded guilty to manslaughter prior to the trial.

The jury's verdicts were rendered on August 2, 2016. A week later, the prosecutor asked the court to release Conklin, Lamas, and Becerra on their own recognizance and stated that he was going to permit Conklin and Lamas to withdraw their pleas to voluntary manslaughter. Conklin and Lamas were thereafter permitted to withdraw their pleas to voluntary manslaughter, and their plea agreements were revised to specify a negotiated disposition of four years for Lamas and three years for Conklin. At sentencing, their prison terms were deemed served due to their credit for time served.[15] Becerra's plea agreement was revised to specify an agreed disposition of four years, and his prison term also was deemed served due to his credit for time served.[16]

Defendant subsequently filed a motion for a new trial. He contended that the fact that Becerra, Lamas, and Conklin received such short sentences and immediate release created "an objective fraud on the jury" because the jury had been led to believe that the men faced long prison terms. Defendant's trial counsel confirmed that he was not arguing that the prosecutor had done anything wrong. However, he maintained that a new trial was warranted because, had the three witnesses "testified at trial to what their deal eventually became, we would have a different kind of argument to the jury" because Conklin and Lamas would not have been admitting involvement in the killing.

The prosecutor explained that he had changed the plea agreements with Conklin and Lamas because, like Conway, they had participated only in the attack on Juan, and the jury had acquitted Conway of all charges related to Heriberto's death. Thus, the

---

[15] Conklin and Lamas each had been in jail for nearly four years and, with conduct credit, each had credit that exceeded seven years.

[16] Becerra had been in jail for nearly four years, and, with conduct credit, he had credit that exceeded four years.

20

prosecutor felt compelled to treat Conklin and Lamas similarly to Conway with respect to criminal liability for Heriberto's death.

The court noted that "there's no evidence that the witnesses knew that coming down the pike was a change in charge," and it denied defendant's new trial motion.

### 2. Analysis

#### a. Prosecutorial Misconduct

Defendant claims that the prosecutor committed misconduct by telling "the jury one story about these men's pleas and sentences" and "thereafter substantially reduc[ing] their convictions and sentences." He argues that this sequence of events "meant that the prosecutor misrepresented the facts to the jury." Defendant maintains that the prosecutor committed misconduct because he "never told the jury that the cooperating witnesses even had the possibility of being released immediately."

The record belies defendant's appellate claim. Defendant conceded below that the prosecutor had not done anything wrong, and the trial court credited the prosecutor's explanation for the change in the plea agreements. As the prosecutor explained, it was the jury's unanticipated verdicts absolving Conway of responsibility for Heriberto's death that led to the changes in Conklin's and Lamas's plea agreements. Nothing in the record supports defendant's contention that the prosecutor made any misrepresentations to the jury concerning the plea agreements with Conklin, Becerra, and Lamas as they existed at the time of trial. At the time of their testimony, their plea agreements were in evidence and were consistent with their descriptions of them to the jury. Notably, each of them expressly told the jury that he faced an uncertain sentence with an upper cap but with no minimum, and the defense elicited their testimony that they hoped that they would be immediately released when they were sentenced, a possibility not foreclosed by their plea agreements. The fact that the jury's verdicts led the prosecutor to revise the terms of these agreements after trial does not retrospectively establish that the prosecutor committed misconduct or in any

21

way misled the jury. Under these circumstances, defendant has not established that the prosecutor committed misconduct because the record does not support his premise that the prosecutor made any misrepresentations.

### b.       *Newly Discovered Evidence*

Defendant contends that the trial court erred in denying his motion for a new trial based on these same facts because, in his view, the changes to the plea agreements were newly discovered evidence that merited a new trial. His basic assertion is that, had the jury been aware of the changes to the plea agreements and the actual sentences imposed, "the jury may well have had a very different understanding of the credibility of these witnesses."

A new trial motion may be brought "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).) " ' "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling will be disturbed only for clear abuse of that discretion." [Citation.] In addition, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citation.]' [Citation.] [¶] ' "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. *That it be such as to render a different result probable on a retrial of the cause*; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " ' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016-1017, italics added.) A new trial motion cannot succeed unless it establishes that it is reasonably probable that the newly discovered evidence would

have produced a different outcome at trial. (*People v. Martinez* (1984) 36 Cal.3d 816, 822.)

We see no abuse of discretion in the trial court's denial of defendant's new trial motion. The proffered new evidence would have established only one significant fact that the jury was not made aware of: that the plea agreements with Conklin and Lamas were revised to eliminate their pleas to voluntary manslaughter. The other facts that arose after trial were within the scope of the testimony at trial. Conklin, Lamas, and Becerra all testified about their roles in the incident, and they testified that their plea agreements did not require any minimum sentence and could lead to their immediate release. Given that the jury found that Conway's role in the incident, which was similar to the roles of Conklin and Lamas, did not merit assigning him any criminal liability for Heriberto's death, it is exceedingly unlikely that the jury would have discredited the testimony of Conklin and Lamas if only the jury had known that they would not ultimately be held criminally responsible for Heriberto's death. The jury had voluminous evidence before it that Conklin, Lamas, and Becerra had entered into highly beneficial plea agreements with the prosecution that greatly reduced their criminal liability and that could result in them gaining their freedom as soon as they were sentenced. Evidence of the posttrial alterations to Conklin's and Lamas's plea agreements to eliminate their liability for Heriberto's death was not likely to play any role in the jury's decision making.[17] The court did not abuse its discretion in denying the new trial motion.

_____

[17] We cannot credit defendant's argument that the fact that the men received greater benefits than they had been promised at the time of trial means that they had a greater incentive to testify falsely at trial. It is undisputed that the prosecutor's posttrial alterations to the plea agreements were unanticipated and unknown to the three men, so it is not possible that the men's trial testimony could have been influenced by something of which they were unaware until after the trial.

### C.     *Lamas's Testimony as a Gang Expert*

Defendant argues that the trial court abused its discretion in permitting Lamas to testify as an expert because Lamas "did not qualify as an expert." He also contends that the trial court prejudicially erred in sustaining objections to certain defense questions of Lamas.

### 1.     *Background*

The prosecutor did not immediately seek to qualify Lamas as an expert when Lamas testified. First, Lamas testified that he had become an RPL member in 2006, that he went to Roosevelt Park nearly every day, and that he had an RPL tattoo on his finger. As an RPL member, Lamas sold drugs and "[f]ought with gang members" who were "Southerners." He engaged in fights several times a week. He considered it his responsibility as an RPL member to ensure that no Sureño was present at Roosevelt Park. If he encountered a Sureño at Roosevelt Park, he would "hit 'em up, . . . [a]sk him where he's from," and fight him if he was a Sureño. Lamas also testified, without being offered as an expert, that defendant, Conway, Felix Villar, Jr., and Victor Villar were RPL members. Lamas testified that, as an RPL member, he attended RPL meetings, which were held about twice a year. He testified that, as a Norteño street gang, RPL was subject to "a hierarchy called NF." And RPL had to pay $200 a month to NF.

After Lamas had given all of this testimony about RPL, the prosecutor offered him "as an expert in regards to the Roosevelt Park Locos Norteno gang." Salas's trial counsel objected and was permitted to voir dire Lamas. On voir dire, Salas testified that he had been a member of RPL for six years and had "[s]treet knowledge" about RPL from "liv[ing] the lifestyle." Older RPL members had guided him in how to be an RPL member, and he had in turn guided younger members. Defendant's trial counsel also voir dired Lamas. He adduced Lamas's testimony that he had been taught how to recruit younger members. Conway's trial counsel also voir dired Lamas. After

this voir dire was completed, the court asked counsel if they objected, and all three counsel submitted. The court then ruled that Lamas could testify as an expert on RPL.

Lamas proceeded to testify that RPL was a Norteño street gang. The Villar brothers were "in charge" of RPL. Lamas testified that Conway and defendant were RPL members, which he knew because he had been at the March 2012 RPL meeting when Conway and defendant were voted into RPL. Lamas also testified that RPL had adopted the Huelga bird as a symbol of the gang.

On cross-examination, Salas's trial counsel asked Lamas if he knew the Penal Code definition of a criminal street gang. Lamas said no. He was next asked if he knew the Penal Code definition of "a gang crime." The prosecutor objected on relevance grounds, and the objection was sustained. Salas's trial counsel then asked Lamas if he was familiar with Penal Code section 186.22, and Lamas said yes, though he conceded that he "didn't study them." He was then asked whether he knew what the requirements were for "a crime to be gang-related." Lamas responded "Sure" before the prosecutor objected on relevance grounds and the court sustained the objection.

### 2. Analysis

Defendant claims that Lamas did not meet any of the qualifications set forth in Evidence Code section 720 to testify as an expert.

Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony." (Evid. Code, § 720.)

25

"Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, disapproved on a different point in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) " ' " 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.' " [Citation.] We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion. [Citation.]' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 128.)

" 'Expertise . . . "is relative to the subject," and is not subject to rigid classification according to formal education or certification.' [Citation.] Rather, an expert's qualifications can be established in any number of different ways . . . . '[T]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance.' " (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294.)

In this case, the trial court could have reasonably concluded that Lamas's knowledge and experience as a longtime member of RPL provided him with sufficient expertise to testify about the inner workings of RPL, a subject that was plainly beyond the common experience of the jurors. Defendant characterizes Lamas as "a run-of-the-mill gang member" and emphasizes that Lamas admitted that he was unfamiliar with the requirements of section 186.22. The trial court permitted Lamas to testify about RPL, not about whether RPL met the requirements of section 186.22, so his knowledge concerning those requirements was irrelevant to his expertise. Although defendant claims that Lamas had no more expertise than any other *gang member*, that

is *not* the standard against which his expertise was to be judged. Defendant was not being tried before a jury of gang members. The trial court could reasonably conclude that the jury would be assisted by Lamas's testimony about RPL since the jury lacked common knowledge and experience of the inner workings of RPL—knowledge and experience that Lamas possessed—or of gangs in general. Accordingly, we find no abuse of discretion in the trial court permitting Lamas to testify as an expert on RPL.

Defendant also suggests that the trial court erred in sustaining objections to a couple of questions that the defense sought to ask Lamas about his knowledge of section 186.22. As we have already noted, Lamas's expert testimony was limited to his knowledge and experience as an RPL gang member. He was not qualified to testify or permitted to testify about the requirements of section 186.22 or about whether a particular crime was "gang-related." "An expert witness may not be cross-examined regarding matters that are not relevant to the expert's opinion or qualifications." (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) Since these questions did not relate to his qualifications or to his expert testimony, they were properly precluded by the trial court. In any case, since Lamas admitted that he was unfamiliar with section 186.22, there is no possibility that the court's sustaining of objections to further questions on this subject was prejudicial.

### D. *Assault as a Natural and Probable Consequence of Murder*

Defendant maintains that the trial court should not have instructed the jury that he could be liable for the assault on Juan as a natural and probable consequence of the murder of Heriberto because there was insufficient evidence to support this theory of liability.

### 1. *Background*

The jury was instructed on the natural and probable consequences theory of liability for the assault count. "If you find the defendant is guilty of [murder], you must then decide whether he is guilty of assault with force likely to produce great

27

bodily injury listed in Count 2. Under certain circumstances a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that [defendant] is guilty of [aggravated assault], the People must prove that, one, that [*sic*] [defendant] is guilty of murder. Two, during the commission of the murder, a coparticipant in that[18], Scott Conway, James Conklin, Angel Lamas and/or Javier Hernandez committed the crime of assault with force likely to produce great bodily injury. And three, under all of the circumstances a reasonable person in defendant's position would have known that the commission of assault with force likely to produce great bodily injury on Juan Reyes was a natural and probable consequence of the commission of the murder of Heriberto Reyes." "A coparticipant in a crime is the perpetrator, or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

The natural and probable consequences theory was the only theory of defendant's liability for the assault count that the prosecutor argued to the jury. "It's not aiding and abetting. We're not arguing that." "[A] reasonable person would expect that an attack of such a nature as this would result in injuries to others." "The natural and probable consequences of their attack on Heriberto, knowing that Juan Reyes, his brother was probably going to try to defend him and try to take care of him. And the evidence shows that. The natural and probable consequences of attacking the little brother is that Juan Reyes is going to get hurt."

---

[18] It should have said "murder" after "that," but the court's instruction failed to include that word.

28

### 2. *Analysis*

Defendant argues that the court prejudicially erred in instructing the jury that he could be held criminally liable for the assault on Juan as a natural and probable consequence of the murder. He maintains that (1) there was no evidence that he personally participated in or urged or aided others to commit the assault on Juan, (2) "there was insufficient evidence that the attack by others on Juan Jr. was the natural and probable consequence of Appellant's attack on Heriberto," and (3) the assault on Juan was not reasonably foreseeable.[19] Defendant also argues that the trial court erroneously instructed the jury on the mens rea element of natural and probable consequences liability. We requested supplemental briefing on whether there was sufficient evidence to support a finding that defendant aided and abetted a principal *in the murder* who then committed the assault, which is an essential component of natural and probable consequences liability.

The natural and probable consequences theory is an extension of aider and abettor liability. An aider and abettor is a person who knowingly and intentionally encourages and aids a perpetrator in the commission of a criminal offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The natural and probable consequences theory extends the aider and abettor's liability not only to the crime that he or she encouraged and aided but also to any other crime committed by the perpetrator if that other crime was a natural and probable consequence of the crime the aider and abettor encouraged and aided.

"To apply the 'natural and probable consequences' doctrine . . . [, t]he jury must decide whether the defendant (1) with knowledge of the confederate's

---

[19] He maintains that there was "no evidence" that he, Salas, or Becerra, the perpetrators of the murder, "knew that Juan Jr. had any particular personal relationship with Heriberto, other than they both were at the basketball court at the same time." The record is to the contrary, but this fact is irrelevant to our disposition of this issue.

unlawful purpose, and (2) the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 267.)

The evidence in this case does not support application of the natural and probable consequences theory to defendant's liability for the assault on Juan. Defendant's natural and probable consequences liability for the assault hinged on a finding that defendant aided and abetted either Conway, Conklin, Lamas, or Hernandez *in the murder*.[20] In other words, one of those four people had to have been a principal in the murder who was aided and abetted by defendant.[21] Yet none of them were actually involved in the perpetration of the murder.

The prosecutor's theory was that these four people aided and abetted defendant and Salas in the commission of the murder by assaulting Juan and thereby diverting him from defending Heriberto. But the jury affirmatively

---

[20] The Attorney General contends that the instruction did not limit the universe of possible aiders and abettors, so there could have been someone else who aided and abetted the murder and participated in the assault. Suffice it to say that the instruction was exclusive, not inclusive, and there was no evidence that some other unidentified person aided and abetted both the murder and the assault.

[21] Both an aider and abettor and a perpetrator are principals in a crime. (*People v. Smith* (2014) 60 Cal.4th 603, 611.) Thus, it makes no difference that defendant was a perpetrator of the murder. "When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.) Here, we are not concerned with *defendant's* role in the murder but with the role played in the murder by the principals in the assault.

rejected this theory when it found that Conway was *not* a principal in the murder by acquitting him of all criminal liability for Heriberto's death.[22] No evidence was presented at trial that Conklin, Lamas, or Hernandez played any role in the murder distinguishable from that of Conway: they participated in the assault on Juan, but not in the attack on Heriberto. And there was no evidence that any of them harbored implied malice as to Heriberto. (*People v. Gentile* (2020) 10 Cal.5th 830, 850 [aider and abettor of implied malice murder must harbor implied malice].) Although the prosecutor maintained that the assault on Juan in and of itself facilitated the killing of Heriberto, the jury rejected that theory by acquitting Conway of murder and all of its lesser included offenses.

Since the record does not support the only theory of criminal liability that the prosecution pursued on the assault count, the prosecution may not retry this count.[23] "[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient . . . ." (*Burks v. United States* (1978) 437 U.S. 1, 18.)

---

[22] The prosecutor pursued two theories of Conway's liability for murder. One was that he was guilty of murder because his assault on Juan was an act that he committed with the intent to aid and abet the murder of Heriberto by defendant and Salas. The other was that the murder of Heriberto was the natural and probable consequence of Conway's assault on Juan because "Conway prevented Juan Reyes from saving his brother." Conway's coparticipants in the assault for natural and probable consequences purposes were identified in the jury instruction as defendant, Salas, Conklin, Lamas, and Hernandez. The jury's acquittal of Conway rejected both theories.

[23] Although we requested supplemental briefing on whether double jeopardy would bar retrial on this count, the Attorney General submitted no argument on that point. We take this omission as a concession that retrial is barred.

### *E.  Cumulative Prejudice*

Although we have found prejudicial errors that require reversal of the first degree murder count and the assault count, these errors each affect only the count to which they relate.  Accordingly, there is no cumulative prejudice.

### *F.  Amendments to Section 186.22*

Defendant contends that amendments to section 186.22, which took effect on January 1, 2022, require a remand for retrial of the gang enhancements and special circumstance and of the active gang participation count.

Assembly Bill No. 333 (Stats. 2021, ch. 699) amended section 186.22, which defines both the crime of active participation in a criminal street gang (section 186.22, subd. (a)) and the criminal street gang enhancement (section 186.22, subd. (b)).[24] Three of the changes made by Assembly Bill No. 333 narrowed the scope of section 186.22.[25]  First, all references to "benefit, promote, further, or assist" have been narrowed to require that "the common benefit is *more than reputational*," and the amended statute provides that "Examples of a common benefit that are more than reputational . . . include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subds. (e)(1), (g), italics added.) The statute did not previously contain that limitation.  Second, the definition of " 'criminal street gang' " has been narrowed to require that the group's "members

---

[24] Assembly Bill No. 333 (2021-2022 Reg. Sess.) also enacted section 1109, which requires bifurcation of gang enhancement allegations upon request and of any active participation count unless the other substantive counts "require gang evidence as an element of the crime."

[25] The gang special circumstance incorporates the definition of a criminal street gang set forth in section 186.22.  "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22 . . . ."  (§ 190.2, subd. (a)(22).)

*collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) The definition previously could be satisfied by individual, rather than collective, activity. Third, the definition of a "pattern of criminal gang activity," which is part of the definition of a criminal street gang, has been narrowed to preclude the use of "[t]he currently charged offense . . . to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) Under the previous version of the statute, the current offense could be used to establish the pattern. (*People v. Loeun* (1997) 17 Cal.4th 1, 10.)

Defendant contends, and the Attorney General concedes, that the narrowed definitions in the amended statute apply retroactively to him since the judgment in this case was not final when the amended statute took effect. We agree. When a statute is amended to "redefine, to the benefit of defendants, conduct subject to criminal sanctions," the "inference of retroactivity" to all nonfinal judgments under the "*Estrada* rule" applies unless the Legislature has clearly signaled its intent that the statute apply only prospectively. (*People v. Frahs* (2020) 9 Cal.5th 618, 628-629, 631-632; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) Retroactive application of such a statute requires remand where the jury was not required to make the findings required by the amended statute unless the Attorney General can establish that the absence of such findings was harmless beyond a reasonable doubt. (Cf. *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72; *People v. Chiu*, *supra*, 59 Cal.4th at p. 167.)

We cannot conclude beyond a reasonable doubt that defendant's jury found that the narrowed requirements of the amended statute were satisfied. First, the jury did not find that offenses other than the current offenses satisfied the pattern requirement. The prosecution's gang expert testified that the conduct of Salas, Hernandez, Lamas, Conklin, Conway, Chavarria, and Becerra during the April 2012 incident qualified as "pattern offenses" under section 186.22. The jury was instructed that the current offenses could be used to establish a pattern, and the prosecutor argued that the current

33

offenses established the requisite pattern. Second, the jury did not find that the benefit to RPL was more than reputational. The prosecution's gang expert testified that these crimes benefitted RPL because they promoted the "stature" of both the gang and the members who participated in the crimes. The jury instructions did not bar the jury from using reputational benefits to satisfy the gang benefit element. The prosecutor argued that the gang benefited because the offenses caused people to fear and respect RPL.

Under these circumstances, as the Attorney General concedes, a remand is required for potential retrial of the gang enhancement allegations, the gang special circumstance allegation, and the active participation count.

## V.     DISPOSITION

The judgment is reversed. On remand, the prosecutor may elect to retry the first degree murder count, the active participation count, the gang allegations, and/or the special circumstance. The trial court is directed to strike the assault count due to the insufficiency of the evidence. If the prosecutor elects not to retry any counts or allegations, the trial court shall resentence defendant for second degree murder.

_____

ELIA, ACTING P.J.

WE CONCUR:



_____

BAMATTRE-MANOUKIAN, J.



_____

WILSON, J.



*People v. Lynch*
H046478